UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

HAUL HUB, INC.                                    :  Civil Action No. 3:16cv1221 (SRU)
    Plaintiff                                       :
                                                       :
V.                                                        :
                                                       :
SEAN DEVINE                                      :
TOGGLE PROFESSIONAL SERVICES, LLC   :
    Defendants                                    :
_____: AUGUST 4, 2016


**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

    The Defendants Sean Devine and Toggle Professional Services, LLC hereby reply to the Plaintiff's Complaint dated July 21, 2016 (Document 1) as follows:

**ANSWER**

    1.    The Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation.

    2.    Admitted.

    3.    Admitted.

    4.    Admitted.

    5.    Admitted.

    6.    Admitted.

    7.    Admitted.

    8.    The characterization of the Defendants as "Haul Hub's former software developers" is denied. Otherwise, admitted.

    9.    The Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation.

1

10.    Denied.

11.    The Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation.

12.    The Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation.

13.    The Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation.

14.    Denied.

15.    Denied.

16.    Denied, insofar as this paragraph alleges that Spinelli reached out to Devine "by text message". Otherwise, admitted.

17.    Denied.

18.    The first sentence of paragraph 18 is denied. The second sentence of paragraph 18 is admitted, except as to "[i]nstead,", which is denied.

19.    Admitted.

20.    So much of paragraph 20 as alleges that "[o]n January 11, 2016, Devine was given permission for his Haul Hub work to use a confidential password protected Google Shared Drive, which contained Gigster's work on the Haul Hub Application and Platform" is admitted. The remainder of paragraph 20 is denied.

21.    So much of paragraph 21 as alleges that "[o]n January 12, 2016, Gigster, Spinelli and Devine participated in a normally scheduled teleconference to review Gigster's progress on its work for Haul Hub" is admitted. The remainder of paragraph 21 is denied.

22.    Denied.

2

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Denied.

28.     Denied.

29.     Denied, as to the date alleged. Otherwise, admitted.

30.     Denied, to the extent this paragraph indicates that the referenced work began after January 19, 2016. Otherwise, admitted.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Admitted that "[o]n or about June 3, 2016, Spinelli informed Devine that Spinelli was planning to issue founders shares in Haul Hub to a potential investor". As to the remainder of paragraph 35, the Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation.

36.     Admitted.

37.     Admitted that Devine "requested that he be made the CEO of Haul Hub". The remainder of paragraph 37 is denied.

38.     Denied.

39.     Denied.

40.     Admitted.

41.     Admitted.

42.     Paragraph 42 is denied insofar as it alleges that "Devine became defensive and". The remainder of paragraph 42 is admitted.

43.     Denied.

44.     Admitted.

45.     Paragraph 45 is denied insofar as the word "finally" suggests that the consulting agreement was previously withheld. The remainder of paragraph 45 is admitted.

46.     The Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation.

47.     Denied.

48.     Denied.

49.     Admitted.

50.     The Defendants lack knowledge or information sufficient to form a belief about the truth of the first sentence of paragraph 50 insofar as it alleges that "Haul Hub reengaged the services of Gigster to complete work on Haul Hub's Application and Platform." The remainder of paragraph 50 is denied.

51.     Denied.

52.     Paragraph 52 is admitted insofar as it alleges that "Devine and Toggle have admitted that Toggle and Devine continue to work for the large transportation company".  The remainder of paragraph 52 is denied.

**AS TO COUNT I**

53.     The Defendants' answers to paragraphs 1 through 52 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

4

54.     Denied.

55.     Denied.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

**AS TO COUNT II**

60.     The Defendants' answers to paragraphs 1 through 59 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

67.     Denied.

**AS TO COUNT III**

68.     The Defendants' answers to paragraphs 1 through 67 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied that any action of Devine or Toggle was "illegal". Otherwise, admitted.

5

## AS TO COUNT IV

73.     The Defendants' answers to paragraphs 1 through 72 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

74.     Denied.

75.     Denied.

76.     Denied.

77.     The Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation.

78.     Denied.

79.     Denied that Devine and Toggle were contracted developers for Haul Hub or that said Defendants unjustly used or disclosed such trade secrets. Otherwise, admitted.

80.     Denied.

81.     Denied.

## AS TO COUNT V

82.     The Defendants' answers to paragraphs 1 through 81 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

83.     Denied.

84.     Denied.

85.     Denied.

86.     Denied.

87.     Denied that Devine and Toggle were contracted developers for Haul Hub or that said Defendants unjustly used or disclosed such trade secrets. Otherwise, admitted.

88.     Denied.

89.     Denied.

**AS TO COUNT VI**

90.     The Defendants' answers to paragraphs 1 through 89 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

91.     Denied.

92.     Denied.

93.     Denied.

**AS TO COUNT VII**

94.     The Defendants' answers to paragraphs 1 through 93 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

95.     Denied.

96.     Denied.

97.     Denied.

**AS TO COUNT VIII**

98.     The Defendants' answers to paragraphs 1 through 97 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

99.     Admitted.

100.     Denied.

101.     Denied.

**AS TO COUNT IX**

102.     The Defendants' answers to paragraphs 1 through 101 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

103.     Denied.

104.    Denied.

105.    Admitted.

106.    Denied.

### AS TO COUNT X

107.    The Defendants' answers to paragraphs 1 through 106 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

108.    Admitted.

109.    Denied.

110.    Denied.

111.    Denied.

### AS TO COUNT XI

112.    The Defendants' answers to paragraphs 1 through 111 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

113.    Denied.

114.    Denied.

115.    Denied.

116.    The Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation.

### AS TO COUNT XII

117.    The Defendants' answers to paragraphs 1 through 116 of the Complaint are hereby re-alleged and incorporated by reference, as if fully set forth herein.

118.    Denied.

119.     The allegations contained in this paragraph are, in substance, a prayer for relief, and therefore cannot be admitted or denied.

## FIRST AFFIRMATIVE DEFENSE (Fraud)

1.-126.     The allegations as to the parties, and paragraphs 1 through 126 of the various counts of the Defendants' Counterclaim (following) are hereby re-alleged and incorporated by reference, as if fully set forth herein.

127.     The aforesaid false representations were made by Spinelli and/or the Plaintiff as statements of fact.

128.     The aforesaid false representations were untrue and known to be untrue by the party making them.

129.     The aforesaid false representations were made to induce Devine and Toggle to act upon them.

130.     Devine and Toggle did act upon the aforesaid false representations to their injury.

## SECOND AFFIRMATIVE DEFENSE (Promissory Estoppel)

1.-130.     Paragraphs 1 through 130 of the First Affirmative Defense are hereby re-alleged and incorporated by reference, as if fully set forth herein.

131.     Spinelli and/or the Plaintiff made clear and definite promises to Devine and Toggle that said Defendants had a co-equal equity interest in the HaulHub Project.

132.      Devine and Toggle reasonably relied on those promises.

133.     Those promises induced the actions taken by Devine and Toggle in reliance.

## THIRD AFFIRMATIVE DEFENSE (Lack of Standing By the Plaintiff)

1.-133.     Paragraphs 1 through 133 of the Second Affirmative Defense are hereby re-alleged and incorporated by reference, as if fully set forth herein.

134.    Upon information and belief the Plaintiff Delaware corporation is bereft of corporate formalities, has no legitimate interest in the joint enterprise described in detail in the Counterclaim, and is merely a shell corporation which is being used by Joseph Spinelli to perpetrate fraud upon the Defendants.

135.    The Plaintiff Delaware corporation has no authority to bring or prosecute the present action.

## COUNTERCLAIM

### PARTIES

1.    The Counterclaim Plaintiff Sean Devine ("Devine") is a natural person residing at 16-R Drumlin Road, West Simsbury, Connecticut.

2.    The Counterclaim Plaintiff Toggle Professional Services, LLC ("Toggle") is a Connecticut limited liability company with a principal place of business at 16-R Drumlin Road, West Simsbury, Connecticut.

3.    At all pertinent times, Devine has been a member of Toggle and he uses the company exclusively to conduct his business ventures.

4.    Upon information and belief, the Counterclaim Defendant Haul Hub, Inc. is a Delaware corporation.

### JURSISDICTION AND VENUE

1.    This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332(a), in that the Counterclaim Plaintiff and the Counterclaim Defendant are citizens of different states and the amount n controversy exceeds $75,000.00, exclusive of interest and costs.

2.    Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims herein occurred in the District of Connecticut.

## FIRST COUNT (Fraud)

1.      On January 5, 2016, Joseph Spinelli, a former acquaintance of Devine's from college, contacted Devine through Facebook Messenger with a business proposal.

2.      In his January 5, 2016 message, Spinelli advised Devine that he was "working on something, it's right up your alley with your trucking background", and he was looking for a "CTO/ cofounder type person".

3.      Spinelli was seeking such a person to develop with him a web-based service company which would connect independent dump truck drivers with construction companies for the scheduling and performance of services on construction projects (hereafter, the "HaulHub Project").

4.      It would later become apparent that Spinelli was in fact seeking such a person to exploit, by utilizing that person's talent, energy, and resources, and then "freezing out" such person from a promised stake in the enterprise, and converting that person's work product for his exclusive gain.

5.      Upon information and belief, Spinelli knew Devine's professional history, much of which is public knowledge by virtue of LinkedIn and other information available on the internet.

6.      At the time he was contacted by Spinelli, Devine had a great deal of executive experience and was an expert in the transportation industry. For example, Devine co-founded and was Vice-President of Products and Services of CombineNet, a pioneer in optimization-based strategic sourcing used primarily by the world's largest companies to source all modes of transportation, was Vice- President of Consulting for Emptoris, another provider of optimization-based supply management solutions, had been Vice-President of Enterprise Engineering and Chief

Procurement Officer for Con-way Inc, one of the largest transportation companies in North America, and had provided consulting services to over thirty-five Fortune 500 on matters related to strategy, purchasing, and logistics.

7.     In their initial exchange of messages on January 5, 2016, Devine told Spinelli "I sold a business last year, and mostly work with the company that acquired it."

8.     Devine also told Spinelli, on January 5, 2016, that he "probably wouldn't be interested in a "job" at all" but that the Haul Hub Project was "a good fit with my expertise in just about every way and I suspect that means that there is a good opportunity of some sort."

9.     On January 8, 2016, Devine and Spinelli met in person for approximately eight hours at Devine's residence in West Simsbury, Connecticut, and at Puerto Vallarta, a restaurant in Avon, Connecticut.

10.    In the course of their extensive January 8, 2016 meeting, Devine and Spinelli agreed that they would be joint venturers in the HaulHub Project: each would own 50% of the equity in the company that would be formed and each would have one of a total of two directors' seats.

11.    In exchange for the promise of such a 50% equity interest, Devine agreed to oversee the combined development of a business model, processes, and technology, and to personally do as much of the technology development as possible.

12.    Spinelli committed to providing or obtaining a budget of $100,000.00 for development expenses, and agreed to be primarily responsible for customer sales, sourcing (*i.e.*, establishing business relationships with truckers who would be matched to particular construction jobs), and day-to-day job operations, including customer service.

13.     Under their agreement, Devine and Spinelli agreed to share responsibility for business strategy, corporate governance, and obtaining financing for the start-up of the project's operations.

14.     At no time did Devine and Spinelli discuss or contemplate an employer-employee relationship, as Devine made it clear to Spinelli from the outset that he was only interested in being involved in the HaulHub Project as a full partner.

15.     In their January 8, 2016 meeting, Devine disclosed to Spinelli that he (Devine) and Toggle were subject to a non-compete agreement resulting from the sale of a business previously mentioned, but that the other party to the agreement does not engage in dump truck brokerage, that the non-compete was limited to businesses that actually competed with the other party, and so he was free to start HaulHub with Spinelli.

16.     Upon information and belief, in more than one billion dollars in transactions since its inception, the other party to the non-compete agreement has never brokered a dump truck, and it does not market itself in that line of work.

17.     Devine also disclosed to Spinelli that he was committed to perform consulting work for the other party to the non-compete agreement for most of 2016, although he would also commit to spending a substantial amount of time working on the HaulHub Project.

18.     On the basis of the agreement reached between Devine and Spinelli on January 8, 2016, and in good faith reliance on the understanding they had reached in that agreement, Devine began strategy and project management work the very next day, January 9, 2016.

19.     Consistent with the parties' agreement, Devine undertook such work with no salary arrangement in place, and all of the parties' interactions in the coming months, until their falling out, are consistent with their agreement as described above.

13

20.     Upon information and belief, in or around November 2015, Spinelli had entered into an agreement with a company known as "Gigster" to design an internet platform for the Haul Hub Project.

21.     On January 10, 2016, Spinelli introduced Devine to Gigster as the person that would oversee such development.

22.     On January 11, 2016, Spinelli provided Devine with a Gigster<>HaulHub Google Drive folder. On that date, Devine sent Spinelli a text message to share his opinion that if Gigster was used the project would be slowed down and be more expensive, although Devine was prepared to defer to Spinelli's decision on this because he respected Spinelli's relationship with and commitment to Gigster.

23.     On January 12, 2016, Devine and Spinelli met with Gigster by phone. The topic of the meeting was "milestone 2 (design)" which, upon information and belief, was one of the milestones which had been set forth in Spinelli's agreement with Gigster.

24.     At that point, Gigster had performed some design work, but it was not complete. Because the business model and process infrastructure had not been figured out, Gigster was unable to finish most of the work.

25.     On January 13, 2016, Spinelli sent Devine a text message indicating that he had decided to take Devine's advice to not proceed with Gigster. Spinelli told Devine that he would tell Gigster "we need to pause the work after design because what we have scoped and what we actually need to build are two totally different things."

26.     Also on January 13, 2016, Spinelli sent an e-mail message to Gigster terminating their involvement in the HaulHub Project and explaining: "Sean and I really need to spend a few weeks designing out what we need in a build. Without a really well thought out plan we really

can't ask you to build something. What you would be building is the tip of the ice burg [sic] but without the underlying system built underneath which is more extensive, the build would not be able to launch."

27.     On January 15, 2016, Spinelli sent another e-mail message to Gigster, again directing Gigster to stop work on the HaulHub Project and advising: "We will save that credit for a future Gigster gig once we refine our model and infrastructure requirements."

28.     Gigster never delivered any code, and did not even finish basic design work.

29.     Also on January 15, 2016, Spinelli introduced Devine to a potential investor, a friend and associate of Spinelli's named Oscar Johnson, in a meeting at Dom's Coffee in Avon, Connecticut.

30.     Referring to Johnson, Spinelli told Devine that "we don't need to sell him. he is on board. he wants to meet you. the three of us will be the core group".

31.     In the January 15, 2016 meeting, Devine disclosed to Johnson (with Spinelli present) the non-compete agreement, and told them that it would not prevent him from being a principal in HaulHub, a fact he had disclosed previously to Spinelli. During this meeting, Devine showed Johnson and Spinelli some of the development and infrastructure work he had already done for the project since joining forces with Spinelli only a week before.

32.     Following the meeting, Spinelli told Devine that Johnson had offered to invest in HaulHub, but, in a text message, Spinelli stated: "i don't see a need to take money right now. i can fund the development. id like to get this live and see what we have."

33.     Upon information and belief, on January 26, 2016, unknown to Devine, Spinelli filed papers purporting to establish "Haul Hub, Inc." as a Delaware corporation.

34.    Spinelli received numerous written messages from Devine which made it apparent that Devine believed the project would eventually be incorporated as one or more entities bearing the name "HaulHub". Spinelli concealed the existence of the Delaware corporation Haul Hub, Inc. from Devine, the name of which utilized a slightly different spelling.

35.    On February 8, 2016, Devine sent a text message to Spinelli stating: "i spoke with my father [a lawyer] this weekend about the risk issue that we discussed. he agrees that separate entities are the way to go. most bulletproof way would be to have a single HaulHub Technology LLC and then one HaulHub Trucking Services LLC per state. would make it very difficult to "pierce the corporate veil", and wouldn't be too big of a hassle. might create good opportunities for local partnerships/investors too."

36.    Spinelli responded to the foregoing text message by stating: "yes. that's the consensus. each state or region will have to be separate for max protection."

37.    By means of such statement, Spinelli affirmatively concealed from Devine the existence of the Delaware corporation he had just formed.  Spinelli continued to conceal and make misrepresentations about this fact in the ensuing months, even suggesting, in May 2016, that Devine handle the company's incorporation.

38.    Between January 9, 2016 and June 30, 2016, Devine and Toggle contributed an enormous amount of work to the HaulHub Project, essentially completing the strategy formation, business process design, technical architecture, development of the server application, completion of the visual design and implementation of the visual design for all clients, development of the broker and trucker client applications, development of some of the customer client application, development of a simple marketing website, technical infrastructure including the hosting of the

development, staging, and production environments, and development of the roadmap for future development.

39.     Devine and Toggle neither expected nor received any compensation for such services, in reliance on the January 8, 2016 agreement described above, although a total of $20,000.00 was received by Toggle (by means of payments in March, May, and June 2016) to cover a portion of the out-of-pocket expenses that had been incurred during development. Such an expense reimbursement was contemplated from the beginning of the parties' business relationship and had been specifically agreed to in the January 8, 2016 meeting. These funds were received in the form of three checks to Toggle from "R Bates", a construction company owned or controlled by Spinelli.

40.     Spinelli sent Devine many text messages consistent with and designed to induce Devine's reliance on his agreement with Spinelli that the two owned an equal share of the equity and were partners in the new company (although at times Spinelli expressed a desire to cut investors in), including:

a-)     "im fired up man. we are going to crush this!!" (January 14, 2016);

b-)     "our valuation goes up the more we have I would argue" (January 16, 2016);

c-)     "33 pcnt was just so much to tie up to one guy. really limits us" (January 16, 2016);

d-)     "spend some money on technology like we talked" (January 16, 2016);

e-)     "200k for 10 pcnt id say yes to him. Maybe 15pcnt" (January 16, 2016);

f-)     "keeping money on a house account might help us with our cash float" (January 16, 2016);

g-) "gives us some time to refine our model. really hone in on what we want to get done for the first year. and then grab some dough. i think we have something here" (January 19, 2016);

h-) "she started at 80k. i offered 30. Haha"; (January 26, 2016);

i-) "maybe three guys @50 each for now?. I'm for it. this guy for 50. oscar for 50. and a buddy of mine who spent 80k on trucking last yer" (February 4, 2016);

j-) "ill talk to oscar tomorrow about $$. get ball rolling…." (March 8, 2016);

41.     By the late spring of 2016, Devine and Toggle had built an impressive and working business model and software platform that was used to successfully execute "beta" transactions.

42.     In said beta test, thirty-three actual dump truck shifts were handled utilizing seventeen separate truckers, which realized a total of $25,216.00 in revenue.

43.     In response, Spinelli bubbled with excitement about the experience of using the process and software that Devine and Toggle had developed.

44.     On May 23, 2016, Spinelli sent a text message to Devine, in which he enthused about how fast the sourcing and on-line acceptance process worked: "new haulhub record. 1 minute to accept….probably check the server logs. might be 30 secs".  On May 25, 2016, Spinelli sent a text message to Devine, stating: "think i might have landed another customer without even trying. ordered a truck for them today for tomorrow. meeting the dude tomorrow afternoon. referral from the other guy from monday. guy says can u get me a truck for tomorrow on our introductory call. 11 mins later. done. he was like wtf??!! how did you do that?"

45.     The tiny amount of intellectual property that existed prior to the involvement of Devine and Toggle had been provided to them by e-mail, and they built the rest.

46.     As designed and built by Devine and Toggle, HaulHub is a multi-tenant platform that manages the brokerage of dump truck jobs from construction-related companies to trucking companies. It includes self-registration features for truckers and customers, and supports complex multi-party relationships between users, brokers, truckers, and customers. The platform enables the creation of multi-shift dump truck jobs including the definition of specific schedules, contacts, and operational requirements. It has a robust rating engine that enables flexible broker and trucker-pricing, and shift level fee-based cancellation. The platform enables an end-to-end workflow for job creation, customer tender acceptance, trucker sourcing and tender acceptance, time card submission and approval, and invoice submission and approval. It includes dashboards and scorecards for broker users to enable management-by-exception and robust analytics. A notification engine generates email and text notifications to all parties related to key events. The platform is optimized for desktop and mobile use.

47.     Devine and Toggle themselves developed the project's trade secrets and confidential information, through non-publicly available sources. Spinelli's contribution to this aspect of the project was minimal.

48.     By so doing, Devine and Toggle developed the HaulHub Project from almost nothing and created massive value for the project.

49.     The outlay of time and effort by Devine and Toggle which was required to create that value was significant, to wit:

a-)     Devine personally spent over 800 hours on the HaulHub Project, for which he received no compensation. The market rate for Devine's time ranges from $150.00 to $300.00 per hour, depending upon the particular engagement. With respect to the HaulHub Project, Devine's

time was completely at risk, so his expected return from the project was significantly above this range;

b-)   Brian Davies, a Toggle employee and developer, spent more than 500 hours on the HaulHub Project, for which he received compensation from Toggle in the amount of $8,210.00, an effective hourly rate of $16.42;

c-)   Ben Reynolds, a Toggle employee and developer, spent more than 220 hours  on the HaulHub Project, for which he received compensation from Toggle in the amount of $3,613.00, an effective hourly rate of $16.42; and

d-)   Milind Alvares d/b/a "Hash Cookies", an independent contractor and designer/developer hired by Toggle spent approximately 285 hours on the HaulHub Project, and received compensation from Toggle in the amount of approximately $10,000.00 (there is some unbilled time for this contractor outstanding), an effective hourly rate of $35.00.

50.    The above employee rates for Toggle employees and the independent contractor are significantly below market. The average market rates for similar services at similar talent levels is at least $65.00 to $75.00 per hour. The lost opportunity cost for Toggle, which could have utilized these employees for other projects, was itself at least $46,000.00.

51.    Devine created additional value for the HaulHub Project by recruiting these workers based on his own connections and his ingenuity in recruiting technology talent from remote geographical areas and areas outside more established tech hubs, *i.e.*, northern Colorado, Nashville, Tennessee, and Goa, India.

52.    The market value of the services provided by Devine and Toggle, exclusive of costs, was over $200,000.00. But all of this value was at risk, in accordance with the agreement

between Devine and Spinelli. Accordingly, Devine's expectation of a return from this effort was many times higher.

53.     Spinelli admitted that he recognized the stake Devine and Toggle had in the HaulHub Project.

54.     By early June, 2016, Spinelli was again negotiating with Oscar Johnson to obtain financing for the HaulHub Project. One arrangement being discussed was that Johnson would receive 25% of the project's equity in exchange for a $200,000.00 cash investment.

55.     The deal under consideration assumed that "pre-money" valuation of the HaulHub Project was $600,000.00.

56.     On June 6, 2016, Spinelli sent an e-mail to Devine in an attempt to convince him to accept said arrangement, stating of the arrangement: "it basically values your time…at 300k".

57.     Said statement recognizes that Devine and Toggle contributed substantial value to the HaulHub Project and constitutes an admission by Spinelli that Devine owns a one-half equitable interest in the project ($300,000.00 being one-half of $600,000.00, the estimated pre-money valuation of the project).

58.     In the late winter and early spring of 2016, Spinelli and Devine had taken some meetings with potential investors, as described above, but Spinelli had maneuvered to defer taking outside investment so as to avoid further particularizing his agreement with Devine and Toggle, and thereby losing power, while Devine and Toggle continued to develop the project.

59.     Spinelli believed, correctly, that the key to building HaulHub was to proceed through the beta-testing stage, for which he needed Devine and Toggle. Having acquired that value, Spinelli focused on squeezing Devine and Toggle out, preferably by bringing in an investor,

like Johnson, whom he considered a close ally, in order to relegate the interest of the Defendants in the forming company to a minority interest.

60.     By the late spring of 2016, with an operational platform successfully tested, Spinelli stepped up his efforts to obtain financing for the HaulHub Project, and he encouraged Devine to be an integral part of that effort and/or used him to that end, stating, in various text messages:

a-)     "i need to do a writeup for investor presentation. can you put together a quick over view of what you have built. and a quick paragraph on you and your background. probably going to assemble a few pages. similar to a prospectus. so our investors will have something…" (May 10, 2016);

b-)     "i probably have 50k in so far total with HH. i was going to just keep that as a note and either convert to stock later or payback if we had a boatload of money. what if I get oscar to match whatever i have in. then give him half of boston HH. that would set the first franchise at $100k. not a bad number. We have the PERFECT guy for HH Rhode Island. we would give hime RI. the cape. southeastern mass And easter CT maybe for $100k. maybe me and oscar throw another 25k each. get dave walsh to throw in 50k. so thats another 100k into the kitty ontop of oscars 50k. 150k total…oscar says he would be in for 250k" (May 24, 2016);

c-)     "we should have another pow wow on the company structure. apperently llc is not good for oscar for tax reasons. he sent me something"  (May 24, 2016);

d-)     "we can capitalize with some of the guys we have. but we need a series A. $5m plus at 20m";

e-)     "we need staff" (June 3, 2016);

f-)     "so when we issue shares. i think we should cut oscar in for some founders shares. i don't know what percentage. but he is really been valuable. i probably chat with him 3 times a

week. he gets all kind of intel for me. he will be knocking doors down for us. he already is. his contribution is starting to add up."  (June 3, 2016);

g-)      "maybe its possible for me and you to hold 80pcnt. 20 pcnt goes to seed investors. oscar and ron?" (June 3, 2016);

h-)      "if I croak or you croak. thats a big blow to the company" (June 3, 2016);

i-)      "you are the key to the fundraise. ron can set the meet. get everybody hot on the idea. but you are the guy who will come in and close it out" (June 3, 2016);

j-)      "he gets the best deal he can. brings it to us for the vote" (June 3, 2016);

k-)      "i haven't offered him a position. but i told him me and you been workin on this thing. it has legs. we need to raise money. think you can help us? he said yes. he would really be interested in doing that type of thing" (June 3, 2016);

l-)      "you got any angel money people?" (June 4, 2016);

m-)      "oscar invited us to his cape house in Falmouth for the day. work retreat. he wanted to get together. he has a nice boat down there. take a rip to the vineyard. talk shop. grab dinner. call it a board meeting on the water. he doesn't really know you. only met that once. he getting ready to write a big check."

61.      While continuing to entertain the possibility of receiving funding from Oscar Johnson, who was a friend and associate of Spinelli's, in exchange for a share of the company, Devine also secured an expression of interest from a former business partner of his own, John Labrie, to be another investor.

62.      Notwithstanding that he had asked Devine to line up "angel money people" the prospect of Labrie's participation caused Spinelli to fear that it would be more difficult for him to take control of the enterprise, and he began to act upon his plan to force Devine out.

63.     Although the parties had never discussed or settled on formal roles or titles, by the late spring of 2016, it was also becoming necessary, in addition to obtaining financing, for Spinelli and Devine to further define and formalize their roles with respect to their fledgling enterprise.

64.     Devine's efforts to do this set in motion a chain of events in which Spinelli's scheme to assert control of the project and exclude Devine from same, was ultimately revealed.

65.      On June 3, 2016, while not purporting to be making a unilateral decision, Devine sent a text message to Spinelli suggesting: "not to be too direct, but we should have me run the thing. my background is as dead-center as it gets. but I think it'd be a great idea to have someone to handle ap/ar/finance. here's my take on ideal roles: You: Chief Commercial Officer (grow customers, carriers, agents/offices). Me: CEO/CTO (tech, strategy, general management). Someone/Ron: CFO (finance, AP, AR). Not sure if you agree with that, but that's what I would do I think. We're both pretty versatile."

66.     A multi-day discussion about roles ensued, but Devine and Spinelli were unable to reach a consensus.

67.     Spinelli and Devine scheduled a meeting with Oscar Johnson to further discuss financing for June 16, 2016.

68.     Spinelli was called away unexpectedly as a result of a job site accident in connection with his construction company, and Devine and Johnson unexpectedly met without him.

69.     Following that meeting, Johnson called Devine and told him he was out of the deal, information that Devine immediately passed on to Spinelli.

70.     On June 17, 2016, Spinelli sent a text message to Devine, unilaterally declaring: "i am the ceo of haulhub. if you cant deal than we deal with that issue now". Devine replied that

neither of them could unilaterally declare themselves CEO. On the same date, Spinelli also texted: "remember, the ceo works for the board. and me and you are the board. he works for us."

71.     Also on June 17, 2016, Spinelli sent a text message to Devine referring to the "1 share each" that they each owned, and stating: "I never looked at you as a hired employee. and I am a man of my word." Even at that late date, Spinelli admitted that Devine has a co-equal equitable interest in the HaulHub Project.

72.     Spinelli, and Devine and Toggle reached an impasse, and their business and personal relationships have broken down. Spinelli has wrongfully demanded that Devine disclaim his equitable interest in the project, and turn over the intellectual property that will allow the project to operate. Were Devine and Toggle to do so, they would be effectively "frozen out" of the company and would be irreparably harmed. A co-equal owner of a business enterprise cannot unilaterally terminate a co-owner and board member.

73.     Shortly thereafter, Spinelli embarked on a course of conduct wherein he attempted to extract or extort Devine's interest in their joint enterprise from him, using false and threatening messages, as well as the threat to file the present lawsuit.

74. Upon information and belief, Spinelli contacted the attorney for Devine's ex-wife, in an attempt to interfere in a state court custody dispute in which Devine is involved, as a means to blackmail or extort Devine into capitulating.

75.     Upon information and belief, on July 6, 2016, Spinelli sent an e-mail to Devine's father, a New York attorney, using the pseudonymous e-mail address "johnhoule", in which he threatened to expose Devine for allegedly filing a false financial affidavit in the custody case. Spinelli/Houle told Devine's father: "the document contains financial representations of the

defendant [Devine] which were made under the penalties of perjury. You should probably have a look at that document. 'If you tell the truth, you don't have to remember anything'- Mark Twain".

76.    Spinelli then sent a text message to Devine, stating: "July 9 has come and gone. I am giving you 48 hours to figure out how you plan on making me whole. So there I sno misunderstanding I will file a 13 page complaint in Federal Court as soon as July 13th. Atty Cruz has told me she will file a motion for contempt against you. we will all watch you testify under oath about your sworn financial affidavit you filed three weeks ago. I suspect [Devine/Toggle's customer, the other party to the non-compete agreement] will become aware of these matters within days of a federal filing with your name on it.

77.    Upon information and belief, on July 12, 2016, Spinelli also wrote a phony e-mail to Devine's father, again using the pseudonymous e-mail address "johnhoule", in which he threatened to expose Devine's alleged breach of the aforesaid non-compete agreement to the attorneys for other party to that agreement, thereby interfering in such business relationship, unless Devine and Toggle capitulate. Upon information and belief, Spinelli/Houle threatened: "[p]lans have been made to fly to Texas to meet with [attorneys] Strasburger & Price. The plan is to present all documentation, correspondence and alike [sic] and have the Texas Company decide for themselves if Sean Devine has violated his agreements. The intent is to have the Texas Company join the cease and desist against your son."

78.    Upon information and belief, Spinelli has also re-engaged Gigster, in an attempt to replicate the platform that Devine and Toggle developed without the obligation to recognize the equity interests of Devine and Toggle. Should that work proceed Devine and Toggle would be irreparably harmed.

79. The present lawsuit represents an attempt by Spinelli to wrongfully deprive Devine and Toggle of their interest in the company they were instrumental in creating, including by characterizing the Defendants as "Haul Hub's former software developers". .

80. At all times, Devine and Toggle have proceeded in the utmost good faith.

81. The Plaintiff and/or Spinelli have breached the agreement described aforesaid.

82. The Plaintiff and/or Spinelli have made numerous misrepresentations to Devine and Toggle, including but not limited to concealing and misrepresenting the corporate formation of the Plaintiff, and concealing and misrepresenting Spinelli's intention to deprive Devine and Toggle of their interest in the company after inducing them to fully develop the company's operating platform.

83. Said course of conduct constituted a scheme or design to wrongfully deprive Devine and Toggle of such interests.

84. At all pertinent times, the Plaintiff corporation has been used by Spinelli as an instrument of said fraudulent scheme.

85. The aforesaid false representations were made by Spinelli and/or the Plaintiff as statements of fact.

86. The aforesaid false representations were untrue and known to be untrue by the party making them.

87. The aforesaid false representations were made to induce Devine and Toggle to act upon them.

88. Devine and Toggle did act upon the aforesaid false representations to their injury.

## SECOND COUNT (Promissory Estoppel)

1.-88.   Paragraphs 1 through 88 of the First Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

89.   Spinelli and/or the Plaintiff made clear and definite promises to Devine and Toggle that said Defendants had a co-equal equity interest in the HaulHub Project.

90.   Devine and Toggle reasonably relied on those promises.

91.   Those promises induced the actions taken by Devine and Toggle in reliance.

## THIRD COUNT (Breach of Contract)

1.-91.   Paragraphs 1 through 91 of the Second Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

92.   Spinelli and/or the Plaintiff formed an agreement with Devine and Toggle by which which Devine and Toggle were to have a co-equal equity interest in the HaulHub Project with Spinelli and/or the Plaintiff.

93.   Devine and Toggle fully performed their obligations under that agreement.

94.   Spinelli and/or the Plaintiff breached the material terms of that agreement.

95.   Devine and Toggle incurred damages resulting from said breach.

## FOURTH COUNT (Breach of Fiduciary Duty)

1.-95.   Paragraphs 1 through 95 of the Third Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

96.   Spinelli and/or the Plaintiff had a business relationship with Devine and Toggle which was, or was akin to, partners or joint venturers.

97.   Said relationship is characterized by a unique degree of trust and confidence.

28

98.     By virtue of the scheme specified above, Spinelli and/or the Plaintiff had superior knowledge of the parties' business situation and were under a duty thereby to represent the interests of Devine and Toggle.

99.     Spinelli and/or the Plaintiff breached that duty, thereby causing harm to Devine and Toggle.

**FIFTH COUNT (Declaratory Judgment)**

1.-99.   Paragraphs 1 through 99 of the Fourth Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

100.    Devine and Toggle have an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the parties' rights or other jural relations.

101.    There is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties.

102.    In the event that there is another form of proceeding that can provide Devine and Toggle immediate redress, Devine and Toggle should be allowed to proceed with their claim for the declaratory judgment despite the existence of such alternate procedure.

**SIXTH COUNT (Intentional Interference With a Business Relationship)**

1.-102.       Paragraphs 1 through 102 of the Fifth Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

103.    A business relationship, including a non-compete agreement, exists between Devine and Toggle and a customer of theirs.

104.    Spinelli and/or the Plaintiff intentionally interfered with said business relationship while knowing of the relationship's existence.

105.    Devine and Toggle may incur actual loss as the result of such interference.

**SEVENTH COUNT (Piercing the Corporate Veil (Instrumentality Rule)**

1.-105.    Paragraphs 1 through 105 of the Sixth Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

106.    Spinelli exercised complete domination and control over the policy and business practices of the corporate Plaintiff with respect to the transactions described above.

107.    Said domination was employed to commit a fraud or wrong, perpetrate a dishonest or unjust act, or violate a legal or statutory duty.

108.    Said domination proximately caused an injury or unjust loss to Devine and Toggle.

**EIGHTH COUNT (Quantum Meruit)**

1.-108.    Paragraphs 1 through 108 of the Seventh Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

109.    Spinelli and/or the Plaintiff knowingly accepted the services of Devine and Toggle.

110.    Spinelli and/or the Plaintiff represented to Devine and Toggle that they would be compensated in the future.

111.    By such representation Spinelli and/or the Plaintiff impliedly promised to pay Devine and Toggle for the services rendered.

112.    The services were performed.

113.    Payment was not made.

**NINTH COUNT (Unjust Enrichment)**

1.-113.    Paragraphs 1 through 113 of the Eighth Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

114.    Spinelli and/or the Plaintiff received a benefit from Devine and Toggle for which Spinelli and/or the Plaintiff unjustly did not pay.

30

115.   Said failure to pay for that benefit was to the detriment of Devine and Toggle.

**TENTH COUNT (Unfair Trade Practices)**

1.-115.   Paragraphs 1 through 115 of the Ninth Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

116.   The aforesaid practices of Spinelli and/or the Plaintiff, without necessarily having been previously considered unlawful, offend public policy as it has been established by statutes, the common law, or otherwise, and are within at least the penumbra of some common law, statutory, or other established concept of unfairness.

117.   The aforesaid practices of Spinelli and/or the Plaintiff were immoral, unethical, oppressive, or unscrupulous.

118.   The aforesaid practices of Spinelli and/or the Plaintiff caused substantial injury to other businesspersons, *i.e.*, Devine and Toggle.

**ELEVENTH COUNT (Misappropriation of Trade Secrets)**

1.-118.   Paragraphs 1 through 118 of the Tenth Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

119.   At all pertinent times, Devine and Toggle have safeguarded the processes and trade secrets of the HaulHub Project and/or the Plaintiff.

120.   Spinelli and/or the Plaintiff are seeking to acquire and use, and have acquired and used, such trade secrets without the express or implied consent of Devine and Toggle, by improper means, including misrepresentation, in violation of Conn. Gen. Stat. Section 35-51, *et. seq.*

**TWELFTH COUNT (Breach of Implied Covenant of Good Faith and Fair Dealing)**

1.-120.   Paragraphs 1 through 120 of the Eleventh Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

121.    At all pertinent times, a contractual relationship existed between Spinelli and/or the Plaintiff and Devine and Toggle.

122.    Devine and Toggle performed their contractual obligations.

123.    Spinelli and/or the Plaintiff unfairly prevented Devine and Toggle from receiving the benefits they were entitled to receive under the contract.

124.    The conduct of Spinelli and/or the Plaintiff resulted in harm to Devine and Toggle.

## THIRTEENTH COUNT (Injunctive Relief)

1.-124.        Paragraphs 1 through 124 of the Twelfth Count are hereby re-alleged and incorporated by reference, as if fully set forth herein.

125.    The aforesaid actions and misrepresentations of Spinelli and/or the Plaintiff have caused, and will continue to cause, irreparable and immediate injury, loss, and damage to Devine and Toggle, for which Devine and Toggle have no adequate remedy at law.

126.    There is an imminent danger that Spinelli and/or the Plaintiff will use, sell, or reverse engineer the trade secrets and intellectual property created and developed by Devine and Toggle, and that Spinelli and/or the Plaintiff will compete with the enterprise created and developed with Devine and Toggle, or enable others to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Defendants and Counterclaim Plaintiffs Sean Devine and Toggle Professional Services, Inc. request:

1.      Money damages;

2.      Restitution damages;

3.      A decree piercing the corporate veil, so as to hold Joseph Spinelli responsible for all damages and all other relief ordered against the Plaintiff/Counterclaim Defendant Haul Hub, Inc.;

4.      Other equitable relief, including, without limitation, imposing a constructive trust on all of the improper earnings by Spinelli and the Plaintiff/Counterclaim Defendant Haul Hub, Inc.;

5.      Temporary and permanent injunctive relief, including but not limited to a decree directing that Spinelli and the Plaintiff/Counterclaim Defendant Haul Hub, Inc. shall not proceed with the HaulHub Project, shall not further use and misappropriate any trade secrets or other confidential information created and developed by the Defendants and Counterclaim Plaintiffs Sean Devine and Toggle Professional Services, Inc., shall not dilute or diminish the interests of Devine and Toggle Professional Services, Inc. in any manner, including by issuing shares of stock or creating any equity interests in the Plaintiff and/or the HaulHub Project, shall not sell, or reverse engineer the trade secrets and intellectual property created and developed by Devine and Toggle, and shall not compete with the enterprise created and developed with Devine and Toggle, or enable others to do so.

6.      A declaration determining the respective rights and responsibilities of the parties in and concerning the HaulHub Project and/or the Plaintiff/Counterclaim Defendant Haul Hub, Inc.,

and further determining that Joseph Spinelli and Sean Devine have co-equal rights in and to such property and entities;

7.    Attorney's fees pursuant to, *inter alia*, Conn. Gen. Stat. §§ 35-54 and 42-110g(d);

8.    Statutory interest pursuant to, *inter alia*, Conn. Gen. Stat. § 37-3a;

9.    Treble damages pursuant to, *inter alia*, Conn. Gen. Stat. § 42-110g;

10.   Punitive damages pursuant to, *inter alia*, Conn. Gen. Stat. § 42-110g(a); and

11.   Such other relief as is just and proper.

## DEMAND FOR JURY TRIAL

The Defendants and Counterclaim Plaintiffs Sean Devine and Toggle Professional

Services, Inc. hereby demand a trial by jury on all issues so triable.

Dated at Avon, Connecticut this 4th day of August, 2016.

DEFENDANTS


By:     /s/ Edward P. Jurkiewicz
        Edward P. Jurkiewicz   ct04779
        Lawrence & Jurkiewicz, LLC
        60 East Main Street
        Avon, CT 06001
        (860) 299-6263(telephone)
        (860) 677-5005 (fax)
        Federal Bar Number ct04779
        edwardjurkiewicz@sbcglobal.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 4, 2016, a copy of the foregoing was served by e-mail and by first-class mail, postage pre-paid, upon the following:

Nuala E. Droney (ct27192)
Peter E. Strniste, Jr. (ct20830)
Kristopher I. Moore (ct29143)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
E-mail:
*ndroney@rc.com*
*pstrniste@rc.com*
*kmoore@rc.com*

Dated at Avon, Connecticut this 4th day of August, 2016.

DEFENDANTS

By:     /s/ Edward P. Jurkiewicz
        Edward P. Jurkiewicz   ct04779
        Lawrence & Jurkiewicz, LLC
        60 East Main Street
        Avon, CT 06001
        (860) 299-6263(telephone)
        (860) 677-5005 (fax)
        Federal Bar Number ct04779
        edwardjurkiewicz@sbcglobal.net